IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RICK JACKSON,                          §
                                       §
                  Plaintiff,           §
                                       §  Civil Action No. 3:07-CV-1837-D
VS.                                    §
                                       §
CRAIG WATKINS, in his                  §
individual and official                §
capacities, et al.,                    §
                                       §
                  Defendants.          §

MEMORANDUM OPINION
AND ORDER

A Caucasian county prosecutor who was terminated following the election of an African-American District Attorney brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and § 21.051 of the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (Vernon 2006), alleging that he was discharged based on his race. Defendants move for summary judgment dismissing plaintiff's federal claims with prejudice and his state claim without prejudice. For the reasons that follow, the court grants the motion.

I

Plaintiff Rick Jackson ("Jackson"), who is Caucasian, worked for the Dallas County District Attorney's Office for almost 17 years.[1] Starting as a misdemeanor prosecutor in 1990, he had by

_____

[1]The court recounts the evidence in a light favorable to Jackson as the summary judgment nonmovant and draws all reasonable

1996 become chief prosecutor of a felony court.  In 2006 Jackson was promoted to Division Chief of the Organized Crime Division ("OCD"), where he remained until his employment was terminated via letter dated December 27, 2006 by defendant Craig Watkins ("Watkins"), who had been elected Dallas County District Attorney in November 2006.[2]  Watkins, who is African-American, replaced Jackson with an African-American.

After Jackson exhausted his administrative remedies, he sued Watkins in his individual and official capacities[3] and sued Dallas County[4] (collectively "Watkins," unless the context requires

---

inferences in his favor. *E.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

[2]Watkins took the oath of office on January 1, 2007.

[3]Because Jackson also sues Dallas County, the suit against Watkins in his official capacity is unnecessary. *See, e.g., Davillier v. State of La. through Dep't of Health & Hosps.*, 1997 WL 276091, at *1 (E.D. La. May 22, 1997) (holding in case in which plaintiff filed suit under Title VII naming her employer, the State of Louisiana through the Department of Health and Hospitals, and her supervisor as defendants, but named supervisor solely in his official capacity, Title VII claim against supervisor in his official capacity should be dismissed because employer had been sued directly); *Harris v. City of Chi.*, 1998 WL 59873, at *10 (N.D. Ill. Feb. 9, 1998) (dismissing, *inter alia*, § 1981 claim against city official in his official capacity as duplicative of claim against city).

[4]Dallas County does not dispute that it can be held liable for Watkins' alleged actions. *See also Brown v. Lyford*, 243 F.3d 185, 192 (5th Cir. 2001) (noting that "a district attorney with the final word on hiring or firing within the district attorney's office sets county policy regarding those decisions," and "[t]hat can then support [*Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978),] liability for the county.").

- 2 -

otherwise), alleging that Watkins discharged him based on his race, in violation of Title VII, § 1981, and § 21.051 of TCHRA.[5] Watkins moves for summary judgment, contending that (1) Jackson cannot recover under Title VII because, under the "personal staff" exception, he is not an "employee" who is entitled to the protections of Title VII; (2) Jackson cannot recover under Title VII or § 1981 because the summary judgment evidence is insufficient to overcome Watkins' legitimate, nondiscriminatory reasons for

---

[5]In his first amended complaint, Jackson also asserts that he is invoking this court's jurisdiction under 42 U.S.C. § 1983. 1st Am. Compl.¶ 5.  He later alleges that he seeks relief under § 1981 "through 42 U.S.C. § 1983." *Id.* at ¶ 24.  The second assertion is based on well-settled Supreme Court and Fifth Circuit precedent.

> [Section] 1981 does not provide an independent cause of action.  In order to remedy violations of § 1981, a plaintiff must assert a cause of action under § 1983.  [Plaintiff's] independent § 1981 claim—not brought through § 1983—against [defendant] is contrary to [Supreme Court precedent].  The express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.  This requirement is not a mere pleading formality.  Because [plaintiff] brought her § 1981 claim independently of her § 1983 claim, the district court did not err by granting summary judgment to [defendant].

*Meyers v. La Porte Indep. Sch. Dist.,* 277 Fed. Appx. 333, 335 (5th Cir. 2007) (per curiam) (citations, internal quotation marks, and some brackets omitted; first brackets added).  In other words, because Jackson sues a state actor for relief under § 1981, he must bring the claim through § 1983.  But he is not asserting a stand-alone § 1983 claim that the court must address separately.

terminating Jackson's employment; (3) Watkins is entitled to qualified immunity;[6] and (4) upon dismissal of the federal claims, the court should dismiss without prejudice Jackson's state-law claim.

II

As a threshold matter, the court holds that Jackson is not entitled to a continuance under Fed. R. Civ. P. 56(f).  Although Jackson maintains that Watkins has failed to satisfy his burden to obtain summary judgment, Jackson argues in the alternative that he cannot present additional evidence essential to his opposition to Watkins' motion for summary judgment because, despite diligent efforts by both parties, no depositions have been taken in this case.  Jackson accordingly asks for additional time to depose the parties and relevant fact witnesses before the court decides Watkins' summary judgment motion.

Rule 56(f) provides:

> If a party opposing [a summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

The continuance authorized by Rule 56(f) is a safe harbor built

---

[6]Because the court is granting summary judgment for Watkins on these grounds, it need not address Watkins' qualified immunity defense.

into the rules so that summary judgment is not granted prematurely. *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987). To comply with the Rule, the party opposing summary judgment must file the specified non-evidentiary affidavit, explaining why he cannot oppose the summary judgment motion on the merits. *Id.* The party may not rely on vague assertions that additional discovery will produce needed, but unspecified, facts. *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001). He must demonstrate why he needs additional discovery and how the additional discovery will create a genuine issue of material fact. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993).

Here, Jackson makes only vague assertions that additional discovery will produce needed, but unspecified, facts. He posits that the "[t]he deposition testimony of the parties and key fact witnesses" which he seeks "encompass[es] essential evidence to justify [his] opposition to [Watkins'] motion." P. Br. 19. Because Jackson has failed to offer a sufficient basis for the court to conclude that postponing a decision on summary judgment will make any difference to the ultimate outcome of this case, the court denies his alternative motion for a Rule 56(f) continuance.

III

Jackson asserts that Watkins terminated his employment based on race, in violation of Title VII, § 1981, and the TCHRA.   Watkins moves for summary judgment on the merits of Jackson's Title VII and § 1981 claims.

A

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 gives "all persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."[7]

The Fifth Circuit has consistently held that "race discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII."  *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 281 n.7 (5th Cir. 2004); *see also Jones v. Robinson*

_____

[7]In 1991 Congress expanded the remedies available under § 1981 by broadening the definition of "make and enforce contracts." "[T]he term 'make and enforce contracts' includes the making, performing, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  § 1981(b); *see Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002).   Moreover, Caucasian employees are protected under § 1981.   *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 289-93 (1976) (holding that § 1981 protects Caucasians against discrimination on the basis of race even though immediate impetus for the bill was necessity for further relief of constitutionally emancipated former African-American slaves).

*Prop. Group, L.P.,* 427 F.3d 987, 992 (5th Cir. 2005) ("[T]he analysis under both [Title VII and § 1981] [is] identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies." (citations omitted)).  Because substantially the same analysis applies to Title VII and § 1981,[8] the court will consider these claims together using the Title VII evidentiary framework.  Except as noted, its conclusions will in turn apply to Jackson's § 1981 claim.

B

In the context of a Title VII race discrimination claim, Jackson must present sufficient direct or circumstantial evidence to enable a reasonable jury to find that his race was a motivating factor in the adverse employment action taken against him.  *See, e.g., Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 652 (5th Cir. 2004) (addressing Title VII claims for race, color, religion, sex, or national origin discrimination).  "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'"  *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 n. 3 (5th Cir. 2003) (Fitzwater, J.) (age discrimination case) (quoting *Sandstad v. CB Richard Ellis, Inc.,*

_____

[8]Watkins' first argument—that Jackson is not an "employee," as defined by Title VII—applies to Jackson's Title VII claim but not to his § 1981 claim.

309 F.3d 893, 897 (5th Cir. 2002)).  A plaintiff who offers "sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 40 (5th Cir. 1996) (citing *Portis v. First Nat'l Bank of New Albany, Miss.,* 34 F.3d 325, 328 n.6 (5th Cir. 1994)).  Because Jackson has not adduced direct proof of race discrimination, he must rely on circumstantial evidence.

If direct evidence is unavailable, Jackson can prove discrimination using the "modified *McDonnell Douglas* approach." *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case).  As modified, *McDonnell Douglas* consists of three stages.  First, Jackson must establish a prima facie case of discrimination, which "creates a presumption that [Watkins] unlawfully discriminated against [him]." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981).  Second, the burden shifts to Watkins to articulate a legitimate, nondiscriminatory reason for the employment action taken against Jackson. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-07 (1993).  Watkins' burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West,* 330 F.3d at 385.  Third, if Watkins meets his production burden, then Jackson may proceed under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid,* 376 F.3d at 312.  Under the pretext

alternative, Jackson must "offer sufficient evidence to create a genuine issue of material fact . . . that [Watkins'] reason is not true, but is instead a pretext for discrimination." *Id.* (internal quotation marks omitted).  Under the mixed-motives alternative, Jackson must offer sufficient evidence to create a genuine issue of material fact "that [Watkins'] reason, while true, is only one of the reasons for [his] conduct, and another motivating factor is [Jackson's] protected characteristic[.]" *Id.* (internal quotation marks omitted).

IV

A

Watkins argues that the protections of Title VII are inapplicable to Jackson because he is not an employee under Title VII, i.e., his position as Chief of OCD falls within the "personal staff" exception.  Title VII defines "employee" to mean an

> individual employed by an employer, *except that the term "employee" shall not include* any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or *any person chosen by such officer to be on such officer's personal staff*, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision[.]

42 U.S.C. § 2000e(f) (emphasis added).  Title VII excludes from its coverage certain persons (i.e., those not covered by civil service

- 9 -

laws) on the "personal staff" of elected public officeholders.  The parties do not contest that Dallas County is a political subdivision of Texas, that Watkins, as District Attorney, is an elected official, or that Jackson was not subject to any pertinent civil service laws.  Jackson contends instead that there are material issues of fact as to whether he was on Watkins' "personal staff."

Although Title VII does not define "personal staff," the Fifth Circuit has identified a non-exhaustive list of factors (the "*Teneyuca* factors") for use in determining whether a plaintiff qualifies as being a member of an elected official's "personal staff":

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Teneyuca v. Bexar County*, 767 F.2d 148, 151 (5th Cir. 1985).  In short, the court looks to the "nature and circumstances of the employment relationship between the complaining individual and the elected official to determine if the exception applies." *Id.* at 152 (internal quotation marks omitted).  Consideration of the

- 10 -

*Teneyuca* factors "must be tempered by the legislative history of this provision which indicates that the exception is to be narrowly construed." *Id.*

> Senator Ervin, the sponsor of the original Senate amendment, agreed that the purpose of the exception was to "exempt from coverage those who are chosen by the elected official, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line advisors." These comments led the Tenth Circuit to conclude: "Thus, it would appear that Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."

*Id.* (ellipses and citations omitted) (quoting *Owens v. Rush*, 654 F.2d 1370, 1375 (10th Cir. 1981)). Because determining the applicability of the personal staff exception is a fact-intensive inquiry, it "'does not lend itself well to disposition by summary judgment,' though this is not a categorical prohibition." *Saddler v. Quitman County Sch. Dist.*, 278 Fed. Appx. 412, 417 (5th Cir. 2008) (quoting *Teneyuca*, 767 F.2d at 152). Where there is no genuine issue as to any material fact, summary judgment can be granted. *See id.* at 417-18 (affirming summary judgment ruling where plaintiff's opposition to summary judgment only addressed the first factor and the other factors "clearly point to [plaintiff] having been a personal staff member of an elected official"); *Teneyuca*, 767 F.2d at 152-53 (affirming summary judgment where several factors were statutorily determined and plaintiff failed to

set forth specific facts showing genuine issue for trial).

                                    B

     To demonstrate the applicability of the personal staff
exception, Watkins points to certain statutory provisions,
averments of his affidavit, and case law.  The first *Teneyuca*
factor is statutorily established: The District Attorney has
plenary power of appointment and removal as a matter of law.  Tex.
Gov't Code Ann. § 41.102(a) (Vernon 2004) ("A prosecuting attorney
may employ the assistant prosecuting attorneys, investigators,
secretaries, and other office personnel that *in his judgment* are
required for the proper and efficient operation and administration
of the office." (emphasis added))[9]; *id.* at § 41.105 ("All personnel
of a prosecuting attorney's office are *subject to removal at the
will of the prosecuting attorney*." (emphasis added)).  Regarding
the second factor, Watkins avers that "[t]he Chief of the [OCD] has
no personal accountability to any entity or individual other than
to me."  Ds. App. 3.  Watkins argues that the third factor is
established by statute because, the Chief of the OCD, like all
Assistant District Attorneys, is obligated to, and by definition
acts in the place of, the District Attorney in all criminal
matters.  *See* Ds. Br. 5-6 (citing § 41.103(b) ("An assistant
prosecuting attorney may perform all duties imposed by law on the

_____

     [9]"In this subchapter, 'prosecuting attorney' means a county
attorney, district attorney, or criminal district attorney."  Tex.
Gov't Code Ann. § 41.101 (Vernon 2004).

prosecuting attorney.")).  Regarding the last three factors, Watkins argues that the nature of the position of Assistant District Attorney "requires a close working relationship" with the District Attorney, and that a District Attorney, upon being elected, is entitled to ensure that his Assistant District Attorneys, who possess the same inherent policymaking authority as he, do not undercut the policies of his administration.  *See* Ds. Br. 6 (citing *Cudd v. Aldrich*, 982 F. Supp. 463, 468 (S.D. Tex. 1997)).

The court concludes that this evidence is sufficient to shift to Jackson the burden of demonstrating that a reasonable jury could find that he was not a member of Watkins' personal staff.  *See Teneyuca*, 767 F.2d at 152 (holding that defendant's evidence on certain of the personal-staff-exception factors was sufficient to shift burden of production to plaintiff); *Nichols v. Hurley*, 921 F.2d 1101, 1111 (10th Cir. 1990) (holding that defendant's submission of statutory provisions and averments in affidavit were sufficient to shift burden to plaintiff).

Jackson neither disputes that Watkins has plenary powers of appointment and removal (the first factor), nor that the person holding the position of Chief of OCD represents Watkins in the eyes of the public (the third factor).  As for the other four factors, Jackson essentially argues that, as the Chief of OCD, he did not fall under the personal staff exception because he did not have a

- 13 -

close personal, immediate relationship with the District Attorney. Jackson maintains that he did not report directly to the District Attorney, but instead reported to the Administrative Chief, a person ranked below even the First Assistant (i.e., two levels below the District Attorney); he met face-to-face with the District Attorney perhaps three or four times; he hardly had any interaction with Watkins; and Watkins bore considerable personal animosity toward him.

Although Jackson, as OCD Chief, may have reported to the District Attorney through the First Assistant and a Division Chief, the court holds under the second *Teneyuca* factor that Jackson was ultimately personally accountable only to the District Attorney. Under Texas law, the District Attorney had plenary powers of appointment and removal with respect to all Assistant District Attorneys, including Jackson. *See* Tex. Gov't Code §§ 41.102(a), 41.105; *see also* Ds. App. 3 (according to Watkins, "[t]he Chief of the [OCD] has no personal accountability to any entity or individual other than to me."); *id.* at 9-10 (organizational chart). And the existence of supervisory intermediaries did not remove Jackson's personal accountability to the District Attorney. *See Taplin v. Johnson*, 90 Fed. Appx. 736, 739 (5th Cir. 2004) (holding that second factor had been satisfied where plaintiff was ultimately accountable to defendant sheriff, even though plaintiff was also accountable to chief deputy); *Montgomery v. Brookshire*, 34

- 14 -

F.3d 291, 295-96 & n.2 (5th Cir. 1994) (holding that this factor was satisfied even though plaintiff was personally accountable to several intermediate supervisors in addition to sheriff).

The fifth factor concerns Jackson's rank within the District Attorney's Office's command structure.   The Fifth Circuit has explained that the personal staff exception becomes less applicable the lower the particular employee's position. *See Montgomery*, 34 F.3d at 296.   The question here is whether Jackson could be considered one of Watkins' "first line advisors." *Taplan*, 90 Fed. Appx. at 740 (internal quotation marks omitted).   Because three levels of supervisors separated Jackson from the District Attorney, and because Jackson communicated directly with the District Attorney only a few times, this factor suggests that Jackson was not a member of the District Attorney's personal staff. *Compare Gunaca v. Texas*, 65 F.3d 467, 472-73 (5th Cir. 1995) (holding that where three levels of supervisors separated investigator from district attorney, the fifth factor suggested investigator was not a member of district attorney's personal staff) *with Taplin*, 90 Fed. Appx. at 740 (holding that plaintiff's position in sheriff's office was consistent with district court's conclusion that she was a member of his personal staff where plaintiff, although not next in line to sheriff, often reported directly to sheriff).

The fourth factor——whether the elected official exercises a considerable amount of control over the position——requires the

- 15 -

court to consider whether the District Attorney actually exercised control over Jackson's daily activities. *See Gunaca*, 65 F.3d at 472 (noting that, in application of fourth factor, the Fifth Circuit emphasizes the "degree of control an employer actually exerts over the employee's day-to-day activities"). Jackson maintains that he met face-to-face with the District Attorney only a few times during his tenure as the Chief of OCD. Such evidence suggests that the District Attorney did not exercise actual control over Jackson's day-to-day activities. *Cf. id.* (holding that evidence that showed that plaintiff investigator spoke with former district attorney "practically every day" established that former district attorney had considerable day-to-day control over plaintiff's activities). Watkins does not dispute that the prior District Attorney did not exercise considerable control over Jackson's position; instead, Watkins maintains that it was this very lack of control that he intended to change, and that irrespective of the relationship that Jackson may have had in the past with the District Attorney, the very relationship between the *position* of the District Attorney (as opposed to the individual holding that position) and his prosecuting attorneys empowers the *position* of the District Attorney to exert control over any of his employees as he sees fit. Because, in application of the fourth factor, the Fifth Circuit stresses the *actual* control exerted (as opposed to the control that the District Attorney had the power to

- 16 -

exert), and because the control exercised over Jackson by virtue of the District Attorney's position (with its plenary power of appointment and removal) is duly accounted for in the court's consideration of the first and second *Teneyuca* factors, the court holds that the fourth factor suggests that Jackson was not a member of the District Attorney's personal staff. *See id.* at 471-72 (stressing actual control over daily activities in application of fourth factor, because statutory provision giving position of district attorney exclusive authority was duly accounted for when considering second factor).

The sixth factor presents a closer question. Although Jackson's lack of direct communication with the District Attorney also suggests that the sixth factor—whether Jackson had an intimate working relationship with the District Attorney—favors Jackson*, cf. id.* at 472 (holding there was intimate working relationship where plaintiff "regularly discussed business with the former district attorney, consulted the district attorney regarding work, and was consulted by the district attorney regarding work."), it is not necessarily determinative, especially considering the intimacy inherent in the nature of an Assistant District Attorney's role in the District Attorney's Office. *See Cudd,* 982 F. Supp. at 468 ("[T]he position of assistant district attorney requires a close working relationship with the district attorney[.]"); *see also Monce v. City of San Diego*, 895 F.2d 560, 561 (9th Cir.

1990)("Although [plaintiff] did not have an immediate personal relationship with the City Attorney and was not personally entrusted with a great deal of responsibility, as a deputy city attorney he was placed in the public eye as a representative of the City Attorney's Office and was empowered to exercise the legal authority of that office.  The personal staff exception applies to this situation.").  Because Watkins concedes that Jackson did not have an intimate working relationship with the District Attorney during Jackson's tenure as Chief of the OCD, and because the control the District Attorney exercised over Jackson by virtue of the District Attorney's position (with its plenary power of appointment and removal) is duly accounted for in the court's consideration of the first and second *Teneyuca* factors, the court concludes that the fourth factor suggests that Jackson was not a member of the District Attorney's personal staff.

Accordingly, considering the *Teneyuca* factors *in toto*, and recognizing the narrow construction to be applied to the personal staff exception, the court holds that a reasonable jury could find that Jackson was not a member of Watkins' personal staff and that he is entitled to the protections of Title VII.

V

The court now addresses the merits of Jackson's race discrimination claims under Title VII and § 1981.

A

Watkins assumes for purposes of this motion that Jackson can establish a prima facie case of discrimination. Ds. Br. 7. He articulates the following legitimate, nondiscriminatory reasons for terminating Jackson: (1) it was important to Watkins to bring a new image and sense of purpose to the OCD following the "fake drug scandal" that occurred in that division under the previous administration; (2) he believed he could not trust Jackson to follow his policies and practices; (3) Watkins' own experience with Jackson was overwhelmingly negative; and (4) Jackson's reputation within the District Attorney's Office and within the legal community practicing in the felony courts in Dallas was that Jackson was disrespectful, unnecessarily confrontational, and uncooperative.[10] Because Jackson asserts only that Watkins' reasons

---

[10]Jackson argues that Watkins has failed to proffer a legitimate reason for his discharge because no reason was given to him at the time he was fired and no legitimate reason has since been given to him. Assuming *arguendo* that Watkins did fail to communicate his reasons directly to Jackson, Watkins has nonetheless proffered in his motion for summary judgment legitimate, nondiscriminatory reasons for the discharge. The court will consider Watkins' alleged failure to communicate these reasons directly to Jackson along with Jackson's other evidence, but the court cannot infer that Watkins' proffered reasons are false simply because of an alleged failure to communicate them directly to Jackson.

for his termination are pretextual, *see* P. Br. 13 ("The reasons given by [Watkins] for firing [Jackson] are nothing more than a pretext for discrimination."), and he does not admit, even in the alternative, that any of the reasons are true, Jackson has opted to proceed under the pretext model and therefore must offer sufficient evidence to create a genuine issue of material fact that each of Watkins' reasons is pretextual. *See, e.g., Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (holding that to establish pretext, plaintiff "must put forward evidence rebutting each of the nondiscriminatory reasons [the defendant] articulates.").

B

Jackson has not met his burden of raising a genuine issue of material fact on the essential element of pretext. Although Jackson recognizes that Watkins relies on multiple reasons for discharging him, *see* P. Br. 10-11, he specifically addresses fewer than all of them, focusing only on the following statement by Watkins:

> Immediately following my election to the position of Dallas County District Attorney, I began receiving input from the legal community which practices in the courts where criminal cases are prosecuted and from the members of the community, some of whom formed my transition team. Certain Divisions within the District Attorney's Office were of particular concern to me, especially the [OCD].

Ds. App. 4-5. Jackson argues that Watkins' assertion that he

relied on information that he received from his transition team in deciding to discharge Jackson is belied by Watkins' response to a request for admissions that he did not know whether anyone on his transition team ever spoke with Jackson about Jackson's prosecutorial philosophy, or about anything pertinent to this civil action. Jackson questions whether Watkins would rely on information from his transition team when he was not even sure anyone from the team had talked to Jackson. Jackson therefore contends that Watkins did not rely on his transition team regarding his decision to discharge Jackson.

This is insufficient to raise a genuine issue of fact that requires a trial. First, regarding this particular proffered reason, a reasonable jury could not find that, merely because Watkins does not know whether anyone on his transition team spoke with Jackson, Watkins therefore could not have relied on information from his transition team when deciding to discharge Jackson. For example, it is possible that the transition team informed Watkins about the community's reaction to the "fake drug scandal" that occurred in the OCD under the previous administration or about Jackson's reputation within the legal community. Watkins could have reasonably relied on this information without knowing whether anyone on the transition team had ever personally spoken with Jackson. Consequently, Jackson has not rebutted this legitimate, nondiscriminatory reason for terminating Jackson.

Second, even if there is a genuine fact question about this one reason for discharging Jackson, Jackson must adduce evidence rebutting *each* of Watkins' reasons. *See Wallace*, 271 F.3d at 220. If he does not do so, summary judgment in favor of Watkins is mandated. *See, e.g., Kretchmer v. Eveden, Inc.*, 2009 WL 854719, at *8 (N.D. Tex. Mar. 31, 2009) (Fitzwater, C.J.) ("Because [the plaintiff] has failed to rebut the first legitimate, nondiscriminatory reason proffered by [the defendant], the court need not address [the plaintiff's] attempted rebuttal of the other reasons proffered by [the defendant]."). Jackson has produced no evidence to dispute Watkins' belief that replacing the Chief of the OCD would have brought a new image to the division following the "fake drug scandal," Watkins' understanding that he could not trust Jackson to loyally implement his practices and policies, Watkins' characterization of his experience with Jackson as "overwhelmingly negative," or Jackson's alleged reputation of being disrespectful, unnecessarily confrontational, and uncooperative. Although Jackson presents evidence of his qualifications and capabilities as a prosecutor, Watkins disputes neither Jackson's qualifications nor his competence. *See, e.g.*, Ds. Br. 7 (assuming Jackson can establish prima facie case of discrimination, including that he was qualified for the position); *id.* at 10-11 ("While [Jackson] may have been a competent prosecutor, his attitude toward and treatment of individuals he dealt with as an assistant district attorney was

- 22 -

described to [Watkins] as, and known by [Watkins], to be disrespectful, demeaning and discourteous.").

Moreover, although Jackson appears to argue that the falsity of Watkins' stated reasons can be inferred from the representations Watkins made during his election campaign and from statistics, both arguments fail to rebut Watkins' stated reasons.  Although Jackson contends that "[i]t [was] well known in Dallas County that Defendant Watkins went out of his way, during his election campaign and at every opportunity since, to make clear he planned to make changes based solely on race" and that "[o]ne of his often utilized mantras involved changing the D.A.'s office to better reflect the racial makeup of Dallas County," P. Br. 13, Jackson offers no summary judgment evidence that any such campaign promise was ever made, and Jackson's mere assertion that such a campaign promise was made is insufficient to counter Watkins' articulated reasons.  *See, e.g., Wallace,* 271 F.3d at 220 ("[T]he plaintiff must produce substantial evidence of pretext[.]" (internal quotation marks omitted) (quoting *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001))).

C

Jackson relies extensively on a statistical analysis of the District Attorney's Office before and after Watkins took office, and on the Fifth Circuit's decision in *Decorte v. Jordan*, 497 F.3d 433 (5th Cir. 2007).  But Jackson's statistical evidence is

insufficient to raise a genuine issue of material fact, and his reliance on *Decorte*, which has a superficial bearing on this case but on closer examination is clearly distinguishable, is likewise misplaced.

In the absence of particularized evidence directly challenging Watkins' announced rationale, statistical evidence cannot rebut Watkins' articulated nondiscriminatory reasons. *See EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1185-86 (5th Cir. 1996) (noting cases that considered proffered statistical evidence probative of pretext only because plaintiff had offered particularized evidence directly challenging defendant's announced rationale); *Deloach v. Delchamps, Inc.,* 897 F.2d 815, 818-20 (5th Cir. 1990) (holding that statistical evidence was probative of pretext only when coupled with other evidence contradicting employer's reasons). Moreover, even if statistics could be considered here, the statistical evidence must be accurate and reliable. *See Merrill v. S. Methodist Univ.*, 806 F.2d 600, 606 (5th Cir. 1986) ("We have cautioned against over-reliance on raw numbers in Title VII litigation because numbers can be misleading if not properly compiled."); *EEOC v. Tex. Instruments*, 100 F.3d at 1185 (holding that statistics that relied on arbitrarily selected cutoff were not probative of pretext). Here, Jackson offers only raw numbers that are not assembled or compiled so as to present any statistically significant or meaningful information about Watkins' employment

decisions.

Jackson argues:

> On January 1, 2007, [Watkins] fired 10 white
> employees and more than 10 other white
> employees felt compelled to leave in lieu of
> being terminated.  In addition, numerous white
> employees were demoted.  In the ensuing two
> years numerous other white employees have left
> the employment of [Watkins' Office].  No
> African-Americans were terminated or demoted
> on January 1, 2007.

P. Br. 3.  Such raw numbers (and vague quantifiers), however, are insufficient to raise a genuine issue of material fact absent information regarding, *inter alia,* the reasons for the Caucasian employees' departures, the total number of Caucasian and African-American employees, and the positions from which the Caucasian employees were fired.  For instance, if the employees at the District Attorney's Office were overwhelmingly Caucasian (as in fact they were, *see* P. App. 12), then even race-neutral decisions would result in more Caucasian employees being fired than African-American employees.  Similarly, if only high-ranking employees were fired and the vast majority of the high-ranking employees were Caucasian (as in fact they were, *see id*.), then the fact that more Caucasian employees than African-American employees were fired would not necessarily be indicative of race discrimination. Jackson also notes that of the eight full-time attorneys immediately fired upon Watkins' taking office, six were replaced by African-Americans.  Again, such raw numbers are inadequate to raise

- 25 -

a genuine fact issue absent information regarding, *inter alia*, the racial composition of the applicant pool.  If, for example, more African-Americans than Caucasians applied for the positions, then the fact that six of the eight positions were filled by African-Americans would not necessarily indicate race discrimination.

Jackson cites *Decorte*, contending it is an analogous case where statistical evidence was used to rebut the employer's proffered nondiscriminatory reasons.  In *Decorte* Caucasian plaintiffs brought a Title VII action against District Attorney Eddie Jordan ("Jordan"), an African-American, following Jordan's termination of the Caucasian plaintiffs shortly after he was elected to office.  Although on the surface *Decorte* seems factually similar to the present case, on closer inspection it is readily distinguishable.  The *Decorte* plaintiffs offered more than just statistical evidence to rebut the employer's articulated reasons, they presented reliable statistical data, and the numbers involved are not comparable to those in the present case.

Unlike Jackson, the *Decorte* plaintiffs did not offer statistical evidence to rebut Jordan's articulated nondiscriminatory reasons *in the absence of* particularized evidence directly challenging Jordan's reasons.  The *Decorte* plaintiffs pointed to Jordan's inconsistent explanations for the challenged employment action.  *See id.* at 439 (evidence showing that recommendations for incumbent employee's retention were based on

performance, employee efficiency, and previous experience contrasted with testimony that recommendations were "just random"); *id.* (testimony that financial considerations drove recommendations contrasted with testimony that recommendations did not result in a budget that was much, if at all, lower than that of the previous office). The plaintiffs also pointed to a report created by Jordan's transition team. The report stated that, within the first 100 days of Jordan's administration, the racial composition of the District Attorney's staff should reflect that of the Orleans Parish. *See id.* at 436, 440. In the present case, by contrast, Jackson has failed to contradict any of Watkins' nondiscriminatory reasons. And although Jackson alleges that Watkins made a campaign promise to make his staff more reflective of the racial composition of Dallas, Jackson has presented no summary judgment evidence that such a promise was ever made. Therefore, unlike the statistical evidence offered here, the statistical evidence in *Decorte*, which the Fifth Circuit determined to be probative of discrimination, did not attempt of itself to rebut the employer's stated reasons, but rather was coupled with other evidence contradicting the employer's reasons.

Furthermore, the *Decorte* plaintiffs, unlike Jackson, presented *reliable* statistical data via expert testimony. The "[p]laintiffs' statistician testified that, according to his analysis: the probability that 53 out of 56 terminated employees would be white

if the terminations were race-neutral was less than one in 10,000; and the probability of the racial composition changing as it did in [the District Attorney's] first 72 days, if the decisions had been made randomly, was less than one in one million." *Id.* at 439-40. Here, as previously discussed, Jackson offers only raw numbers that fail to present any statistically significant or meaningful information regarding the challenged employment decisions.

Jackson argues that while the actual numbers between *Decorte* and this case are "obviously different in scope," "the percentage change in both cases tells the same story." P. Br. 15. "[T]he division chiefs that were fired went from 100 percent white to 66 percent white, a 33 percent change. In *Decorte*, the change was 40 percent." *Id.* Assuming *arguendo* that Jackson's math is correct,[11] and that the proper comparator to the percentage change in Caucasian non-attorney employees in *Decorte* is the percentage change in Caucasian Division Chiefs here (as opposed to the percentage change in Caucasian attorneys), the percentage change here, contrary to Jackson's assertion, does not tell the same story

---

[11]It is unclear how Jackson is calculating the 33% change because it is not clear, based on the organizational chart, *see* P. App. 12-13, whom Jackson is counting as a Division Chief. Assuming a net loss of seven Caucasian Division Chiefs, *see* P. Br. 15 (noting that eight full time attorneys were fired and six were replaced by African-Americans); Ds. Reply Br. 10 (listing eight attorneys, including seven Chiefs and one Deputy Chief, who were terminated); P. App. 12-13 (chart showing that six of the fired Chiefs were replaced by African-Americans and one was replaced by an Asian), in order to arrive at a percentage change of 33%, Jackson must be using a total of 21 Division Chiefs.

as that in *Decorte*.   After all, the story told by a percentage change can depend in material part on the scale of the numbers involved.   For instance, if a workforce of 300 changes from 100% Caucasian to 50% Caucasian, and a workforce of two changes from 100% Caucasian to 50% Caucasian, the percentage changes would be equal, but they would be interpreted quite differently when deciding whether race discrimination was a motivating factor in the change.   Consequently, because the numbers between *Decorte* and this case are so different in scope, the court cannot conclude, as Jackson urges, that the percentage changes in both cases tell the same story of discrimination.

Accordingly, Watson is entitled to summary judgment dismissing Jackson's race discrimination claims under Title VII and § 1981.

VI

Watkins moves to dismiss Jackson's pendent state-law claim without prejudice.   "[W]hen all federal claims are dismissed or otherwise eliminated from a case prior to trial, [the Fifth Circuit has] stated that [its] 'general rule' is to decline to exercise jurisdiction over the pendent state law claims." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)), *overruled in part on other grounds by Arana v. Ochsner Health Plan,* 338 F.3d 433, 440 (5th Cir. 2003) (en banc).   The court discerns no reason to vary from this general rule in this case.   Accordingly, Jackson's

- 29 -

pendent state-law claim is dismissed without prejudice.

*     *     *

For the reasons explained, the court grants Watkins' motion for summary judgment, dismisses Jackson's federal claims with prejudice, and dismisses his state-law claim without prejudice.

**SO ORDERED.**

May 21, 2009.

_____

SIDNEY A. FITZWATER
CHIEF JUDGE